UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAWN D. ACOSTA,                                    :

                              Plaintiff,           :

                     - against -                   :            **ORDER AND OPINION**

                                                   :            **15-CV-4051 (RLE)**

CAROLYN W. COLVIN,                                 :
**Acting Commissioner of Social Security,**

                                                   :

                              Defendant.           :

**RONALD L. ELLIS, United States Magistrate Judge:**

## I.      INTRODUCTION

Plaintiff Dawn Acosta ("Acosta") commenced this action under the Social Security Act

(the "Act"), 42 U.S.C. § 406(g) and/or 42 U.S.C. § 1383(c)(3), challenging the final decision of

the Commissioner of Social Security (the "Commissioner") denying her claim for Social

Security Disability ("SSD") and Supplemental Security Income ("SSI"). On June 9, 2015, the

Parties consented to the jurisdiction of the undersigned for all proceedings pursuant to 28 U.S.C.

§ 636(c). (Doc. No. 7.) On December 16, 2015, the Commissioner moved for a judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to

affirm the Commissioner's decision and dismiss the Complaint. (Doc. Nos. 17, 18, Mem. of Law

in Supp. of Def.'s Mot. for J. on the Pleadings ("Def.'s Mem.").) On January 29, 2016, Acosta

cross-moved for judgment on the pleadings, seeking remand of this action to the Commissioner

for additional proceedings. (Doc. Nos. 23, 24, Mem. of Law in Supp. of Pl.'s Cross-Mot. for J.

on the Pleadings ("Pl.'s Mem.").) For the reasons set forth below, the Commissioner's motion is

**DENIED,** Acosta's motion is **GRANTED**, and the case is **REMANDED** to the Commissioner

for further development of the record.

## II.   BACKGROUND

### A.   Procedural History

Acosta applied for both SSD and SSI benefits on March 23, 2012. [1] (Tr. of Admin. Proceedings ("Tr.") at 13.) She claimed a disability onset date of February 18, 2010. (*Id.*) Her application was denied on June 12, 2012, and on August 9, 2012, Acosta requested a hearing before an ALJ. (*Id.*) Acosta, represented by counsel, appeared in a video hearing before ALJ Michael J. Stacchini ("ALJ Stacchini" or "the ALJ") on June 27, 2013. (*Id.*) The ALJ issued a decision on December 20, 2014, finding that Acosta was not disabled within the meaning of the Act and was not entitled to disability benefits. (*Id.* at 14.) Review by the Appeals Council was requested on February 6, 2014. (*Id.* at 1.) On March 18, 2015, the Appeals Council denied Acosta's request for review and ALJ Stacchini's decision became the final decision of the Commissioner. (*Id.* at 1-4.) Acosta filed this action on May 28, 2015. (Pl.'s Mem. at 5-6.)

### B.   The ALJ Hearing

#### 1.   Acosta's Testimony at the Hearing

ALJ Stacchini conducted a hearing on June 27, 2013. (Tr. at 44.) At the time of the hearing, Acosta was forty-two years old and resided with her boyfriend of two years in an apartment in Newburgh, New York. (*Id.* at 50.) Acosta testified that she has a limited daily routine because of neck and lower back pain. (*Id.* at 51.) Her condition remained stable from her alleged onset date of February 2010, until August 5, 2012, when she testified that her activities decreased further. (*Id.* at 51-52.) Prior to August 2012, Acosta did "some" of the cooking, dusted, did the laundry, and was able to push the shopping cart and "lift the gallons of milk." (*Id.*

---

[1] Acosta had previously been approved for SSD and SSI benefits for the closed period of August 1, 2006 to September 17, 2007. Subsequently, she filed SSD and SSI applications on December 21, 2010, which were denied in April 2011. (Pl.'s Mem. at 4)

at 52.) After that date, she did some shopping in the company of her boyfriend "who pushes the cart" and "lifts the bags;" did a "little bit" of the household cleaning, including "dusting and the laundry;" and no longer cooked at all. (*Id*. at 51.) Acosta testified that she was no longer able to drive, but could drive "to the store and back if [she] ha[d] to." (*Id*. at 63.) In her spare time, Acosta testified that she reads books on her iPad and watches television. (*Id*. at 52.) She said that she stopped going on walks in February 2010 and ceased using public transportation in 2009. (*Id*. at 53.) She denied ever attending movies or eating at restaurants, and stated that she only occasionally goes to dinner at her boyfriend's family's house. (*Id*. at 50-51.)

Acosta testified that she has experienced weakness and numbness throughout the right side of her body, "from the neck down," since 2006, "before [her] first back surgery." (*Id*. at 53.) She also alleged tendonitis in her left shoulder, which she cannot lift. (*Id*.) She claimed that she has reported right-side weakness and numbness to her doctor since October 2010, and denied telling any physician that she did not have weakness in her arms and legs. (*Id*. at 54.) She testified that her doctor never told her that her symptoms were not explained by objective testing. (*Id*.)

Acosta underwent surgery on her cervical spine on May 4, 2012. (*Id.* at 55.) She testified that the surgery "actually made [the symptoms] worse," elaborating that she experienced "more pain in the neck and spine," including "the middle spine instead of just the lower spine." (*Id*. at 63.) She listed the following symptoms: shoulder tendonitis, inability to lift her left arm, no improvement in her right arm, headaches when she sits for too long, and blackouts when she sits longer than forty-five minutes. (*Id*. at 55.) She estimated that she had blacked-out ten times in the past three months. (*Id*.) Though she did not go to the emergency room after any of her blackouts, she visited Drs. Cho, Smith, and Nasir to address the condition. (*Id*.) When she alerted Dr. Smith

to her worsening symptoms, he referred her to Dr. Nasir, a neurologist, for further treatment. (*Id.*) Acosta testified that her tendonitis precluded her from "lift[ing] anything too heavy" because it caused "shooting pain through the neck and down the spine." (*Id.* at 58.) She alleged that lifting anything "over a pound" caused pulling, tightening, and shooting pain. (*Id.*) Acosta testified that physical therapy in the pool did not help but rather "made [her] worse." (*Id.*) At the time of the hearing, Acosta was awaiting the results of a battery of tests ordered by Dr. Nasir, including "MRIs, CAT scans, and . . . bloodwork." (*Id.* at 69.) Dr. Nasir had not yet ordered nerve conduction studies. (*Id.*)

Acosta's lumbar symptoms included an inability to "twist, turn, bend, stoop, stand for too long, sit for too long, [and] walk at all really." (*Id.* at 56.) Acosta also said that her heart is "still very erratic," and that she experienced heart palpitations, hot flashes, and difficulty breathing. (*Id.*) Acosta testified that these symptoms limit her functioning "quite a bit" because they occur "five, ten times a day," requiring her to "lay down and meditate" for forty-five minutes each time. (*Id.* at 56-57.) She said her doctors' only conclusion has been that "the pain is severe inside and that's how [her] body is handling it." (*Id.* at 57.) Acosta claimed that her asthma is well-controlled with medicine, but that she must avoid environmental irritants. (*Id.*) In an effort to prevent attacks, she dusts daily. (*Id.*)

Acosta testified that she has been diagnosed with anxiety, post-traumatic stress disorder ("PTSD"), and depression, and that her neurologist, Dr. Nasir, prescribed Venlafaxine[2] for her symptoms. (*Id.* at 60.) This anti-depressant medication causes her dizziness and nausea. (*Id.* at 63.) She claimed she "[does not] like to be around too many people" or in crowds because of

---

[2] Venlafaxine is an anti-depressant and nerve pain medication commonly used to treat depression and anxiety disorder. *Venlafaxine*, MAYO CLINIC (Jan. 2016), http://www.mayoclinic.org/drugs-supplements/venlafaxine-oral-route/description/drg-20067379.

loud noises, screaming, and yelling. (*Id.* at 58.) She further stated that her mental health symptoms are controlled "very little" by the medication, and that her mental impairments have remained the same since February 2010. (*Id.* at 58, 60.) Acosta testified that she is not currently receiving therapy because she has had great difficulty locating a therapist in the Newburgh area who accepts her health insurance. (*Id.* at 59.) She stated that her last therapy appointment was in May 2009 with therapist Deborah Ryan.[3] (*Id.* at 61.) Her mental impairments have never required her to be hospitalized. (*Id.*)

Acosta testified that her current doctor, Dr. Smith, never told her that she would be able to return to work. (*Id.* at 54.) Dr. Dunkelman, who saw Acosta from December 2012 until February 2013,[4] never told her directly that she would be able to go back to work but she acknowledged that she was aware that Dr. Dunkelman had filed "a medical source statement" indicating that she could go back to work. (*Id.* at 54, 64.) Dr. Dunkelman's report was sent to Social Services, and Acosta subsequently was directed to attend a work treatment program to help her "get back into employment." (*Id.* at 65.) She attended the introductors meeting and filled out paperwork but disagreed with Dr. Dunkelman's assessment. She felt unable to do even "some type of light job" because of her back injury. (*Id.* at 65.)

### 2.   Medical Evidence

#### a.   Initial Spinal Injury and Subsequent Surgeries

Acosta's spinal pain issues began in September 2006, when her husband brutally beat her, causing injuries that required emergency medical attention. (*Id.* at 358.) Emergency room staff told her that "she was lucky to survive this beating." (*Id.*) Her first surgery was an

---

[3] Ryan's letter about Acosta's treatment indicates that the final therapy session was May 26, 2010. (*Id.* at 357.)
[4] The record indicates the period of treatment under Dr. Dunkelman was six months, with monthly appointments beginning in December 2012, and ending on May 6, 2013. (*Id.* at 572-82.)

emergency L4-5 laminectomy discectomy,[5] performed by Dr. Thomas Lee on September 7, 2006. (*Id.* at 250, 359.) On April 24, 2007, Dr. Lee performed a follow-up decompression fusion surgery from L4 to S1. (*Id.* at 39, 337.) Dr. Cho performed a cervical spinal fusion surgery on May 4, 2012. (*Id.* at 585.) On December 31, 2013, Acosta underwent a spinal cord stimulator trial, and had a permanent implant on March 3, 2014. (*Id.* at 661.)

### b.     Treating Physicians

#### (1)     Michael Smith, M.D.

Dr. Michael Smith started treating Acosta on June 29, 2011, after a one-year period when Acosta was without health insurance. (*Id.* at 451.) He treated her until at least January 7, 2013, the date of the last visit in the record. (*Id.* at 610.) During her first visit, Acosta reported "being almost bed ridden occasionally due to pain," "unable to sit for more than five minutes or stand for more than 10 minutes," and claimed she "does best with walking." (*Id.* at 451.) Dr. Smith recorded that prior to her lapse in health coverage, Acosta was taking pain medications Percocet 10mg and Flexeril 10mg as needed. (*Id.* at 451.) At the time of her initial visit, however, she was only taking over the counter Tylenol and Motrin "with minimum improvement of pain." (*Id.*)

Smith stated that Acosta had stopped physical therapy for her back when "pain worsened," and noted previous attempts at chiropractic care were "without effect." After a physical examination, Dr. Smith noted that Acosta experienced pain when he touched her lower back, and tenderness along the center of her lower neck vertebrae. (*Id.* at 451-52.) Acosta also presented with "decreased sidebending/rotation right" and "minimal extension," and exhibited

---

[5] A "laminectomy," also known as decompression surgery, is the removal of the spongy tissue between the disks in the spine to help relieve the symptoms of an injured disk. *Laminectomy*, MAYO CLINIC (Sept. 2015), http://www.mayoclinic.org/tests-procedures/laminectomy/basics/definition/prc-20009521. A "discectomy" is a surgical procedure to remove the damaged portion of a herniated spinal disk. *Diskectomy*, MAYO CLINIC (June 2014), http://www.mayoclinic.org/tests-procedures/diskectomy/basics/definition/prc-20013864.

"pain with range of motion ("ROM")." (*Id.*) Her motor strength and gait were "normal." (*Id.* at 452.) In addition to her asthma medications (Ventolin, Advair, Singulair, and Spiriva), Dr. Smith prescribed hydrocodone-acetaminophen 5mg-325mg, the muscle relaxant Cyclobenzaprine 10mg, and the anti-inflammatory Naproxen 500mg. (*Id.* at 452-53.) Under "Social History," Dr. Smith noted that Acosta was "unemployed at present," "a current smoker," "drinks alcohol occasionally," and "for exercise, she walks on a regular basis." In all of Dr. Smith's subsequent reports, from July 27, 2011 (*id.* at 448), through August 15, 2012 (*id.* at 643), the information under the social history section remains exactly the same. This period of treatment covered the time when Acosta underwent cervical spinal fusion surgery, which suggests this information does not relate to some of the later visits.

On July 27, 2011, Acosta reported recurrent "chest pain" and "sternal pressure" not associated with exertion. (*Id.* at 449.) She also reported "loose" bowel movement with "blood in the stool." (*Id.*) Dr. Smith's examination notes stated "Cardiovascular examination reveals a regular rate and rhythm" and "general tenderness" in the abdomen. (*Id.*) On August 26, 2011, Dr. Smith noted he would "consider MRI" on Acosta's cervical spine. (*Id.* at 447.) The following month, Dr. Smith recorded that "[p]atient has pain in upper left arm, pain to palpation of the lower back ... and left side of neck," "pain in posterior neck," and "left shoulder pain." (*Id.* at 444.) He also noted an abnormal gait, and that Acosta walked with a limp in her right leg. (*Id.*) He ordered an MRI on her cervical spine. (*Id.*) Dr. Smith also noted that he reviewed Acosta's former primary care physician's records and there was "no record of pain except for a referral to neurologist in November 2009." (*Id.* at 443.) He further noted that Acosta reported pain "redeveloped" in November 2009, and neurologist Dr. Lee treated her.[6] (*Id.*) In October, Acosta

---

[6] At the September 26, 2011 visit, Dr. Smith did not have Dr. Lee's records, but indicated that a record release had been mailed in August 2011. (*Id.* at 443.) On October 24, 2011, the notes indicate Dr. Smith was "still waiting for

reported "back pain in neck and lumbar region," "numbness or tingling in right fingers," and "diminished sensation in right leg." (*Id.* at 442.)

In Dr. Smith's record of the November 17, 2011 visit, he "reviewed recent imaging of cervical and lumbar spine" and noted that "possible impingements were on opposite side." (*Id.* at 439.) Because the "imaging did not explain [Acosta's] symptoms," Dr. Smith referred her to a neurologist. (*Id.* at 440.) The November 2011 notes also state that Dr. Smith completed a "DDS temporary disability form" for sixty days but the only disability form in the record from Dr. Smith is dated March 13, 2012. (*Id.* at 440, 402-03.)

Acosta next visited Dr. Smith on March 1, 2012, after an emergency room visit for chest pain. (*Id.* at 436.) Acosta stated that her chest pain started the previous night, and presented as "sharp, stabbing pain" which became "worse with standing, deep breaths." (*Id.*) Acosta also complained of back pain that affected the "entire back" with a "sharp" quality and "severe" intensity. (*Id.*) Acosta reported that the "[p]ain is aggravated by movement, coughing, sneezing, prolonged standing, walking, exertion, sitting, laying, bending and lifting." (*Id.*) Dr. Smith again noted that "MRI findings do not fully explain pain complaints." (*Id.*) Dr. Smith recorded that Acosta was having some difficulty scheduling an appointment with a neurosurgeon because of her lumbar spine surgery within the past ten years, but noted that this medical history should not present a problem since prior surgery was on her lumbar and not cervical spine. (*Id.* at 437.)

Dr. Smith completed an "Employability Determination" in March 2012, selecting "Less than Sedentary" under the exertional function chart. (*Id.* at 403.) This category represented a range of physical exertion limited to under two hours of standing and/or walking and under six hours of sitting a day. (*Id.*) Dr. Smith then checked the box "Patient is currently not capable of

---

records from Dr. Lee." (*Id.* at 441.)

participating in work activities at this time" for an expected duration of "60 days." (*Id.*) He did not answer the final question: "Based on the evidence available to you, does this individual have severe impairment(s) which has lasted, or is expected to last at least 12 months?" (*Id.*)

On April 16, 2012, Dr. Smith conducted a pre-operative clearance examination for Acosta's spinal fusion surgery, scheduled to be performed by Dr. Cho at St. Luke's Cornwall Hospital. (*Id.* at 433.)

### (2)    Michael Cho, M.D. – Surgeon for C-Spine Fusion Surgery

Dr. Michael Cho first saw Acosta for her cervical radiculopathy on March 22, 2012. (*Id.* at 583.) He performed cervical spinal fusion surgery on May 4, 2012. (*Id.* at 585.) During her March pre-op visit, Dr. Cho recorded that Acosta had "worsening" "neck pain since 2008," that "can be as bad as 10/10 in severity" and "Vicodin has not been helpful." (*Id.* at 583.) Acosta reported "numbness in both upper extremities, the right worse than the left." (*Id.*) Dr. Cho also recorded that Acosta "has no weakness in the extremities." (*Id.*) He also detailed that the "MRI of the cervical spine reveals a central disc at C5-6 with mild spinal cord compression . . . worse on the left side." (*Id.*) Dr. Cho's notes from his physical examination listed "normal" cognition, coordination, and cortical functions, as well as normal gait, bilateral motor strength, and sensation. (*Id.* at 584.) Dr. Cho assessed Acosta with "displacement of cervical intervertebral disc without myelopathy."[7] (*Id.*) He advised Acosta that surgery is "more likely to relieve her extremity symptoms," but "not likely to completely relieve her neck pain." (*Id.*)

The record contains a two-page compilation of all follow-up appointments that Acosta

---

[7] "Displacement of cervical intervertebral disc without myelopathy," commonly referred to as "slipped disc," is the protrusion or herniation of the disc between adjacent neck vertebrae, without spinal cord compression. *Displacement, Cervical Intervertebral Disc Without Myelopathy*, MDGUIDELINES, http://www.mdguidelines.com/displacement-cervical-intervertebral-disc-without-myelopathy (last visited Aug. 23, 2016.)

had with Dr. Cho, which contains a number of inconsistencies and evident errors. (*Id.* at 585.)
For example, during the visit on June 7, 2012, Dr. Cho notes that "[Acosta] is taking no
medications" yet lists three pain medications and five additional medications, followed by the
statement, "medication list reviewed and reconciled with the patient." (*Id.*)

At her monthly visit on July 12, 2012, Dr. Cho recorded that Acosta had "difficulty
turning to the left and also looking up" and "when she looks up she develops headaches." (*Id.*)
The record stated that Acosta experienced "no symptoms in the extremities," and noted that
Hydrocodone is helpful. (*Id.*) One entry is undated, and misidentifies her surgery date as August
4, 2012 instead of May 4, 2012. Here, Dr. Cho noted that Acosta reported "left sided neck pain"
and "left upper extremity pain," but "no weakness." (*Id.*) He also recorded that she was "taking
Vicodin, which is helpful to her," and was "scheduled for PT." (*Id.*) The final entry refers to an
October 11, 2012 visit, and Dr. Cho reported that "PT has not been helpful to her. She still has
residual neck pain, but she no longer has radicular pain. She has no weakness in the
extremities." (*Id.*)

### (3) Neal R. Dunkelman, M.D.

Acosta began seeing Dr. Neal Dunkelman in December 2012, and saw him monthly for a
six-month period. (*Id.* 572-81.) Dr. Dunkelman's handwritten records of these appointments are
largely illegible. (*Id.*) The only decipherable information is an MRI report ruling out a rotator
cuff tear, (*id.* at 577.), and a physical employability assessment dated March 15, 2013, which
found that Acosta was capable of "fulltime work" and classified her range of physical exertion as
"sedentary." (*Id.* at 567-68.) In this assessment, Dr. Dunkelman stated that he was treating
Acosta for "failed lumbar surgery" and "failed c-spine surgery." (*Id.* at 567.) Dr. Dunkelman
noted only that the "outcome" was a "chronic condition," and listed one medication,

"oxycodone." (*Id.*) The remainder of the assessment was left blank. (*Id.*)

### (4)    Sayed Nasir, M.D. – Neurologist

Dr. Sayed Nasir began treating Acosta in January 2013, and listed "numbness to right side" as the reason for the first appointment. (*Id.* at 659.) He assessed Acosta with paresthesia[8] and cervical radiculopathy.[9] (*Id.*) He increased her Venlafaxine dosage to 35mg and ordered a brain MRI and a psychiatric evaluation. At a May 22, 2013 visit, Dr. Nasir recorded that Acosta's brain MRI was normal, and he ordered a cervical spine MRI. (*Id.* at 657-58.)

On September 9, 2013, Dr. Nasir reported that the MRI of the cervical spine showed "mild cervical disc disease." (*Id.* at 653.) He also noted the severity of her paresthesia was "mild to moderate," and that the tingling was "worse at night." (*Id.*) In his treatment notes, Dr. Nasir listed "spinal cord stimulator trial"[10] under "cervical radiculopathy." (*Id.*)

### (5)    Thomas Booker, M.D.

Dr. Thomas Booker's medical examination records were submitted to the Appeals Council but the Council found the evidence did not "provide a basis for changing the ALJ's decision." (*Id.* at 2.) Therefore, Dr. Booker's records were not reviewed by the ALJ, and did not bear on his decision.

On September 4, 2013, Dr. Booker completed a "Physical Assessment for Determination

---

[8] Paresthesia is a "burning or prickling sensation . . . usually felt in the hands, arms legs or feet." The sensation is often described as "tingling or numbness." "Chronic paresthesia is often a symptom of an underlying neurological disease or traumatic nerve damage." *Paresthesia*, NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE (Sept. 2015), http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm.

[9] Cervical radiculopathy, commonly called a "pinched nerve," occurs when a nerve in the neck is compressed or irritated where it branches away from the spinal cord. This may cause pain that radiates into the shoulder, as well as muscle weakness and numbness that travels down the arm and into the hand. *Cervical radiculopathy*, ORTHOINFO (June 2015), http://orthoinfo.aaos.org/topic.cfm?topic=A00332&webid=24DAE050.

[10] A spinal cord stimulator is a device used to treat "severe chronic nerve pain" that is unresponsive to conservative treatments, such as medication and physical therapy. "A wire is placed within the spinal canal and connected to an electrical generator implanted beneath the skin in the abdomen," and "electrical pulses are directed along a nerve to block or override pain impulses traveling along same nerve." Ginger Plumbo, *Devices Help Reduce Severe, Chronic Nerve Pain*, MAYO CLINIC (Sept. 20, 2012), http://newsnetwork.mayoclinic.org/discussion/devices-help-reduce-severe-chronic-nerve-pain/.

of Employability" form on behalf of Acosta. (*Id.* at 646.) He recorded her pain as "aching and shooting … in [her] back and neck with radiation into her arms and legs." (*Id.*) He was unable to opine on Acosta's exertional function because he had not performed a functional capacity evaluation. (*Id.* at 647.) Dr. Booker recommended a "spinal cord stimulator and pain med[ications]." (*Id.*)

On December 5, 2013, Dr. Booker issued a letter stating that "Ms. Acosta is scheduled for a Spinal Cord Stimulator Trial on 12/31/13." (*Id.* at 661.) The letter continued, "If successful, she will then require another procedure to implant the permanent device." (*Id.*) Finally, an operative note dated March 3, 2014, detailed the spinal cord stimulator implant surgery and Dr. Booker reported, "[Acosta] has failed conservative therapy including opioids and physical therapy and it was felt that she would benefit from a spinal cord stimulator implant." (*Id.* at 662.)

### (6)   Deborah Ryan, LCSW

Child Protective Services mandated that Acosta attend weekly individual therapy sessions after her daughter was placed in foster care. (*Id.* at 357-58.) Acosta saw therapist Deborah Ryan ("Ryan") from April 22, 2009, to May 26, 2010,[11] and in February 2011, Ryan generated a report for the purpose of Acosta's disability application. The report summarized background information relevant to her mental health, which included a history of childhood sexual abuse and a physically abusive relationship with her husband. (*Id.* at 358.) Ryan prefaced her report by stating that the "reason for [Acosta's] therapy was to have her daughter returned to her" and "this may have led to Ms. Acosta denying some of her symptoms." (*Id.* at 357.) She reported, however, that Acosta was "open and honest" in her therapy sessions. (*Id.* at 360.)

Ryan stated that Acosta's current diagnosis was Adjustment Disorder, Depressed Mood.

---

[11] There is an internal inconsistency in Ryan's letter: she first states she saw Acosta until May 26, 2010, and later lists May 26, 2009 as the last therapy session. (*Id.* at 357, 360.)

(*Id.* at 357.) Ryan noted that Acosta "reported many symptoms of [PTSD], but did not meet the criteria of this diagnosis at the time of treatment." She conceded, however, that "[Acosta] may have met the criteria at an earlier date." (*Id.* at 357.) Acosta discussed with Ryan "how her serious injuries and surgeries prevented her from completing tasks." (*Id.*) Acosta expressed "how angry she felt at the initial removal of her children," and how "now she was not so angry." (*Id.*) Ryan stated that "[Acosta] learned cognitive and dialectical behavior strategies to calm her and think clearly, instead of becoming angry." (*Id.*) Acosta expressed to Ryan that although weekly therapy was no longer court-mandated, "she want[ed] to attend therapy weekly." (*Id.* at 361.) Ryan recommended a program for survivors of child sexual abuse offered by Westchester Jewish Community Services. (*Id.*) The record does not contain contemporaneous treatment notes from Ryan.

### c.   Consultative Opinions

#### (1)   Ammaji Manyam, M.D.

On May 24, 2012, three weeks after Acosta's cervical spinal fusion surgery, Dr. Ammaji Manyam conducted a physical examination of Acosta. (*Id.* at 523.) Dr. Manyam recorded that Acosta's surgical history included her recent cervical fusion surgery, a diskectomy in the cervical spine in 2006, and lumbar fusion surgery in 2007. (*Id.*) Dr. Manyam noted that Acosta "has pain in this cervical area, but this is just a recent post[-]op." (*Id.* at 522) Acosta reported that one year after her 2007 lumbar surgery, she "developed low back pain" which she classified as "a throbbing pain," "so severe," and "at a scale of 10/10." (*Id.*) She claimed it only "calms down with strong pain medications," and even then, to "8/10." (*Id.*) Acosta also reported a hypertension diagnosis in 2005 and an asthma diagnosis in 2002. (*Id.* at 522-23.) Her last asthma flare-up was in August 2011, and required her to go to the "ER for a nebulization treatment." (*Id.*

at 522.) Acosta reported that she has been diagnosed with PTSD. (*Id.*)

Acosta reported that she does not cook and "cannot stand a long time." (*Id.* at 523.) She claimed that her boyfriend does most of the housework because "she cannot lift or bend." (*Id.*) Acosta stated she was able to shower and dress herself, and her recreational activities include watching television, listening to the radio, and reading magazines. (*Id.*)

During the physical examination, Dr. Manyam found Acosta was in "no acute distress" and had a normal gait, but exhibited "some difficulty walking on heels and toes." (*Id.* at 524.) In the musculoskeletal report, Dr. Manyam noted that since a cervical collar was in place, Acosta's cervical spine was not examined. (*Id.*) She recorded that Acosta's lumbar spine flexion was fifty degrees, and extension was seventy-five degrees; Acosta demonstrated full lateral flexion and full rotary movement bilaterally. (*Id.*) Dr. Manyam recorded that Acosta had full range of motion of shoulders, elbows, forearms, and wrists, as well as full range of motion of hips, knees, and ankles. She reported Acosta's upper and lower extremity strength was 5/5. (*Id.* at 525.)

Dr. Manyam listed the following diagnoses: "low back pain [following] lumbar fusion; recent cervical fusion, still recuperating from the surgery; mild intermittent asthma, hypertension, and PTSD." (*Id.*) In her medical source statement, Dr. Manyam reported that Acosta had "mild limitations to bending, squatting, prolonged standing, prolonged sitting, climbing stairs, pushing, pulling, and lifting weights," and concluded that Acosta should also "avoid smoke, dust, and pollen due to asthma." (*Id.*)

### (2)    Leslie Helprin, Ph.D.

Dr. Leslie Helprin conducted a psychological examination of Acosta on the same date as Dr. Manyam's examination, May 24, 2012. (*Id.* at 516.) In Acosta's medical history, Dr. Helprin noted that Acosta had been diagnosed with depression and PTSD, and claimed "the trauma

referred to her spouse's physical and sexual abuse." (*Id.*) She was in therapy from 2008 until August 2010, and also attended Westchester Family Services in 2006 for two years. (*Id.*) At the time of the examination, Acosta was not in treatment.

Acosta reported "difficulty falling asleep," stating that "she awakens five to ten times" with pain and running thoughts. (*Id.* at 517.) Acosta experienced appetite loss. When asked about her depression, she reported sadness. Acosta claimed that she had one suicide attempt in 2009 with "a bottle of pills," although her last suicidal thoughts were eight months prior and she had "no current plan or intent." (*Id.*) Acosta also reported anxiety in the form of a "fear of going out for fear of being hit by a car," an event that has never happened to her. (*Id.*)

Dr. Helprin reported Acosta was "coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting." (*Id.* at 518.) Dr. Helprin reported that Acosta's affect was "restricted"[12] and her mood was "neutral." (*Id.*) Cognitively, Acosta reported that she has "difficulties with short-term memory and focusing." (*Id.*) Dr. Helprin evaluated Acosta's attention and concentration as "intact" based on her ability to "count one to ten forward and backward, do simple calculations, and serial 3s." (*Id.*) Her memory skills were deemed "mildly impaired" based on her ability to recall three of three objects immediately, and two after a five-minute time delay. (*Id.*) Acosta was able to repeat seven digits forward and none backward. (*Id.*) Dr. Helprin gauged Acosta's intellectual skills in the "below average range" and noted her insight and judgment were "good." (*Id.*)

In the medical source statement, Dr. Helprin opined that Acosta was able to "follow and understand simple directions and instructions, perform simple rote tasks and several complex tasks independently, maintain attention and concentration," "make appropriate decisions, relate

---

[12] A "restricted affect" is defined as a far narrower range of emotion than would be expected, or muted emotional reactivity. *Restricted affect*, PSYCHCENTRAL (July 2016), http://psychcentral.com/encyclopedia/restricted-affect.

adequately with others, and deal appropriately with stress." (*Id.*) Dr. Helprin summarized his findings by stating, "[t]he results of the examination appear to be consistent with some psychiatric difficulties, but in itself this does not appear to be significant enough to interfere with [Acosta's] ability to function on a daily basis." (*Id.* at 519.) Dr. Helprin's diagnoses of Acosta included depressive disorder, alcohol and cannabis abuse in full sustained remission, and "rule out" borderline intellectual functioning. (*Id.*) Dr. Helprin recommended "psychiatric intervention for appropriate medication" and a "medical evaluation to determine if her medical conditions preclude her from all work." (*Id.*)

### (3)    M. Marks – State Agency Psychological Consultant

On June 6, 2012, M. Marks, a State Agency psychological consultant "formulated opinions related to [Acosta's] mental condition" based on his review of Acosta's medical records. (*Id.* at 25.) Marks submitted two minimally completed "Psychiatric Review Technique" forms. (*Id.* at 530-56.) In the first submission, dated June 6, 2012, the assessment period was left blank. (*Id.* at 530.) Marks indicated that he considered the record of Acosta's affective disorder and found that the "Impairment [is] not severe." (*Id.*) Marks found that although "a medically determinable impairment is present[,] [it] does not precisely satisfy the diagnostic criteria" for affective disorder, such as "disturbance of mood, accompanied by full or partial manic or depressive syndrome …" (*Id.* at 533.) Marks found that Acosta's functional limitations were "mild" with respect to (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, and (3) difficulties in maintaining concentration, persistence, or pace, and that she "never" experienced repeated episodes of deterioration. (*Id.* at 540.) There is nothing recorded under the "Consultant's Notes" section. (*Id.* at 542.)

The second submission, dated June 7, 2012, indicates that the assessment covers

December 18, 2010, to June 30, 2011. (*Id.* at 544.) In the entire thirteen-page form, there is only a single box checked, indicating the Marks found "insufficient evidence" to make an assessment as to Acosta's medical dispositions. (*Id.*)

### 3.     Vocational Expert Donald Slive's Testimony at Hearing

Vocational expert Donald Slive ("Slive") testified at the hearing. (*Id.* at 72.) Slive stated that Acosta's past work was "as a consumer relations clerk," which is classified as a "sedentary" job. (*Id.*) Slive testified that if a person was limited to "occasional" rotation, flexion, or extension of the neck, she would not be able to do Acosta's past work. (*Id.* at 73.) In response to a follow-up question from Acosta's attorney, Slive stated that a person with these limitations would be able to work as a charge account clerk, a callout operator, and a telephone-rotation clerk, as these roles require "little and no movement. It's all focused on the data screen in front of the individual." (*Id.* at 76.)

Slive testified that if an individual is able to stand and walk for one hour and sit for up to four hours in an eight-hour day, the person would be unable to do any work. (*Id.* at 75.) Further, he testified that in the current market, "more than one unexcused absence in a month … is not acceptable," and all work would be precluded if an individual was off task for fifteen percent of the day in addition to regularly scheduled breaks. (*Id.* at 76-77.) "Regularly scheduled breaks" were defined as "fifteen minutes in the morning, fifteen minutes in the afternoon, and about a half hour to an hour for lunch." (*Id.* at 77.)

### 4.     The ALJ's Findings

On December 20, 2013, ALJ Stacchini issued a decision finding that Acosta was not disabled within the meaning of the Act, and had not been disabled since February 18, 2010, the date she alleged the onset of her disability, through the date of the decision. (Tr. at 14.)

Following the five-step sequential analysis, ALJ Stacchini first found that Acosta had not engaged in substantial gainful activity during the period at issue. (*Id.* at 15.) He then concluded that Acosta had three severe impairments: degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine, and asthma. He found that Acosta did not have an impairment or combination of impairments that met or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the listings"). (*Id.*) ALJ Stacchini found that Acosta retained the residual functional capacity ("RFC") to perform sedentary work, specifying certain limitations. He found that Acosta was capable of performing her past relevant work as a consumer relations clerk, which does not require the performance of work-related activities precluded by her RFC. (*Id.* at 25.) The ALJ further stated that considering Acosta's RFC, age, education, and work experience, there were other jobs existing in the national economy that she was able to perform, including charge account clerk, call out operator, and telephone quotations clerk. (*Id.* at 26-27.) ALJ Stacchini, therefore, denied Acosta's claim. (*Id.* at 27.)

At step two, the ALJ found three of Acosta's impairments to be severe, in that they "significantly affected [Acosta's] ability to perform basic work activities." (*Id.*) He also found the following physical impairments to be non-severe, "caus[ing] no more than a minimal effect on [Acosta's] ability to perform basic work activities": hypertension, hyperlipidemia, a history of colon polyps, left shoulder tendinopathy,[13] and a history of metacarpal shaft fracture. (*Id.* at 16.) The ALJ also found Acosta's mental impairment of affective disorder did "not cause more than minimal limitation in [her] ability to perform basic mental work activities, and [was] therefore

---

[13] "Tendinopathy" is a more recently used term, in lieu of "tendinitis," to describe inflammation and microtears of the tendon. *Tendon Injury (Tendinopathy) – Topic Review*, WEBMD (September 2016), http://www.webmd.com/first-aid/tc/tendon-injury-tendinopathy-topic-overview.

nonsevere." (*Id.*)

At step three, the ALJ concluded that although Acosta's cervical and lumbar impairments were severe, the medical evidence did not "establish the requisite evidence" of any of the impairments under listing 1.04, nor did it evince "an inability to ambulate effectively, as defined in 1.00(B)(2)(b)." (*Id.* at 19.) With regard to Acosta's asthma, the ALJ concluded that the evidence failed to meet the qualification under Listing 3.03A and 3.03B. (*Id.*)

At step four, the ALJ found that Acosta had the RFC to perform sedentary work with the following limitations:

> [C]an occasionally climb ramps or stairs, but cannot climb ladders, ropes, or scaffolds; she can occasionally balance, stoop, kneel, crouch, and crawl; she can frequently rotate her neck and engage in flexion or extension of her neck; she can frequently bilaterally reach with only occasional left overhead reaching; she can have no exposure to fumes, odors, dusts, gases and poorly ventilated areas that effect the respiratory system; and she can have no exposure to unprotected heights and moving mechanical parts.

(*Id.* at 19.) Although the ALJ acknowledged that Acosta's impairments could "reasonably be expected to cause [her] alleged symptoms," he concluded that her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." (*Id.* at 21.) The ALJ found that the "longitudinal evidence of the record supports a finding that [Acosta] is limited . . . but is not as limited as she alleges." (*Id.*)

The ALJ gave little weight to the opinions of Dr. Smith, one of Acosta's treating physicians, because they were "not supported by [Smith's] statements in the records" or consistent with the opinions of the physical consultative examiner. (*Id.* at 24.) Great weight was given to Dr. Dunkelman's opinions because Dr. Dunkelman is one of Acosta's treating physicians and his opinions are "generally supported by the objective medical assessments of record." (*Id.*) Dr. Manyam's opinions, derived from her one-time consultative examination of

Acosta, were assigned "some weight" because she is an expert in her field and her "conclusions are consistent with the ability to work consistent with the RFC." (*Id.* at 23)

In his decision, the ALJ referred to the records of two of Acosta's treating physicians, Dr. Cho, a spinal surgeon, and Dr. Nasir, a neurologist. The ALJ's decision, however, does not reflect what weight, if any, he assigned to this medical evidence. (*Id.* at 24.)

With respect to psychological medical assessments, the ALJ did not reference the treatment notes of Deborah Ryan. He assigned great weight to Dr. Helprin's one-time consultative examination because "she is an expert in her field who based her opinions on a personal examination of [Acosta]" and her opinions are "consistent with [Acosta's] lack of mental health care . . . and continued ability to handle finances, read, watch and concentrate on television, and play and concentrate on video games." (*Id.*) For the same reasons, the ALJ gave great weight to the opinion of M. Marks, the State Agency psychological consultant, adding that his opinions were "consistent with the findings of [Dr. Helprin]." (*Id.* at 25.)

The ALJ dismissed Acosta's subjective testimony regarding her limitations and symptoms as "not credible." (*Id.*) The ALJ cited several of Acosta's allegations that he found inconsistent with her medical records, such as her testimony that she experienced heart palpitations that required her to lie down four to five times a day for forty-five minutes at a time, noting that "there were no such complaints in the medical records and her stress test came back normal." *Id.* at 25. With respect to Acosta's allegations concerning her mental symptoms, the ALJ asserted that Acosta had "not received mental health treatment since 2010" and "has not [been to the] emergency room since she has gone without treatment." (*Id.*)

## C.    Appeals Council Review

Acosta requested review by the Appeals Council following receipt of the ALJ's decision.

(Pl.'s Mem. at 5.) She submitted additional evidence relating to the spinal cord stimulator that was surgically implanted on March 3, 2014. (*Id.* at 661-64.) The Appeals Council denied review on March 18, 2015, and the ALJ's decision became the final decision of the Commissioner. (Pl.'s Mem. at 5.)

## III.   DISCUSSION

### A.   Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. §§ 405(g), 1383(c)(3). Therefore, a reviewing court does not determine *de novo* whether a claimant is disabled. *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)). Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447. Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). If the Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an

applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g., Kohler*,

546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F. Supp. 85, 93 (D. Conn. 1997) (S.S.R.).

In such a case, the court may remand the matter to the Commissioner under sentence four of 42

U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair

record to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008)

(citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

     If the reviewing court is satisfied that the ALJ applied correct legal standards, then the

court must "conduct a plenary review of the administrative record to determine if there is

substantial evidence, considering the record as a whole, to support the Commissioner's

decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).

The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla.  It

means such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v.

NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48.  The substantial evidence

standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a

reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting

*Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

     To be supported by substantial evidence, the ALJ's decision must be based on

consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C.

§§ 423(d)(5)(B), 1382c(a)(3)(H)(i).  The Act requires the ALJ to set forth "a discussion of the

evidence" and the "reasons upon which it is based." 42 U.S.C. §§ 405(b)(1).  While the ALJ's

decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d

1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of

medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand).  Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

## B.   Determination of Disability

### 1.   Evaluation of Disability Claims

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905.  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry:  (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F. Supp. 2d 24, 29 (S.D.N.Y. 1999).  While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations.  20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations."  20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis).  The ALJ's assessment of a claimant's RFC must be based on "all

relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. An ALJ should not consider whether the severity of an individual's alleged symptoms is supported by objective medical evidence. S.S.R. 16-3P, 2016 WL 1119029, at *3. Second, the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49. The ALJ must consider the entire case record, including objective medical evidence, a claimant's statements about the intensity, persistence, and limiting effects of symptoms, statements and information provided by medical sources, and any other relevant evidence in the claimant's record. S.S.R. 16-3P, 2016 WL 1119029, at *4-6. The evaluation of a claimant's subjective symptoms are not an evaluation of that person's character. *Id.*, at *1. In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

2.     **The Treating Physician Rule**

The SSA regulations require the Commissioner to evaluate every medical opinion received. *See* 20 C.F.R. § 404.1527(c); *see also Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative or non-examining physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("SSA regulations provide a very specific process for evaluating a treating physician's opinion and instruct ALJs to give such opinions 'controlling weight' in all but a limited range of circumstances.").

If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) the specialization of the physician; and (5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii); *Schisler,* 3 F.3d at 567-69. The Commissioner may rely on the opinions of other physicians, even non-examining ones, but the same factors must be weighed. 20 C.F.R. § 416.927(e).

The ALJ is required to explain the weight ultimately given to the opinion of a treating

physician. *See* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of

determination or decision for the weight we give your treating source's opinion"). Failure to

provide "good reasons" for not crediting the opinion of a claimant's treating physician is a

ground for remand. *Greek*, 802 F.3d at 375 (citing *Burgess*, 537 F.3d at 129); *see also Halloran

v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("We do not hesitate to remand when the

Commissioner has not provided 'good reasons' for the weight given to a treating physician's

opinion and we will continue remanding when we encounter opinions from ALJs that do not

comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*,

361 Fed. Appx. 197, 199-200 (2d Cir. 2012) (finding reversible error where an ALJ failed to

explain his determination not to credit the treating physician's opinion).  The ALJ is not

permitted to arbitrarily substitute his own judgment of the medical proof for the treating

physician's opinion. *Balsamo*, 142 F.3d at 81.

Furthermore, an ALJ "cannot reject a treating physician's diagnosis without first

attempting to fill any clear gaps in the administrative record," especially where the claimant's

hearing testimony suggests that the ALJ is missing records from a treating physician. *Burgess*,

537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79); *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 438

(S.D.N.Y. 2003) ("[A] proper application of the treating physician rule mandates that the ALJ

assure that the claimant's medical record is comprehensive and complete.").  Similarly, "if an

ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty

to seek out more information from the treating physician and to develop the administrative

record accordingly." *Hartnet v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998), *accord Rosa*,

168 F.3d at 79.

Finally, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the *pro se* claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F. Supp. 481, 486 (S.D.N.Y. 1981)).

### 3.    The Commissioner's Duty to Develop the Record

The ALJ generally has an affirmative obligation to develop the administrative record. 20 C.F.R. § 404.1512(d); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). Under the Act, the ALJ must "make every reasonable effort to obtain from the individual's treating physician ... all medical evidence, including diagnostic tests, necessary in order to properly make" a determination of disability. 42 U.S.C. § 423(d)(5)(B). Furthermore, when the claimant is unrepresented by counsel, the ALJ "has a duty to probe scrupulously and conscientiously into and explore all relevant facts . . . and to ensure that the record is adequate to support his decision." *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999), citing *Dechirico v. Callahan*, 134 F.3d 1177, 1183 (2d Cir. 1998); *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996). Remand to the Commissioner is appropriate when there are "obvious gaps" in the record and the ALJ has failed to seek out additional information to fill those gaps. *See Lopez v. Comm'r of Soc. Sec.*, 622 Fed. Appx. 59 (2d Cir. N.Y. 2015), citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

C.     **Issues on Appeal**

In the current action, Acosta argues several bases for remand to the Commissioner:  (1) the Appeals Council erred in failing to consider new and material evidence from Dr. Booker; (2) the ALJ improperly evaluated Acosta's credibility, leading to RFC, Step 4, and Step 5 determinations that fail to satisfy the substantial evidence requirement; and (3) the ALJ erred in finding Acosta's affective disorder and left shoulder tendinopathy non-severe. The Commissioner argues that the record contains "ample support" for all of the ALJ's findings, and thus under the substantial evidence standard, the decision must be affirmed.

Having considered the Parties' arguments and the record as a whole, the Court finds that remand is necessary for further development of the administrative record.

### 1.     The ALJ Properly Found that Acosta's Affective Disorder and Left Shoulder Tendinopathy are Non-Severe

Acosta argues that ALJ Stacchini erred in finding that her affective disorder and left shoulder tendinopathy were non-severe, arguing that the medical evidence in the record meet the threshold standard at Step Two, commonly known as the "severity regulation." *Dixon v. Shalala,* 54 F.3d 1019, 1030 (2d Cir. 1995). A severe impairment is one that "significantly limits an individual's physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(b)(4-6). An impairment is not severe if the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." S.S.R. 85–28, 1985 WL 56856, at *2 (quoting *Brady v. Heckler,* 724 F.2d 914, 919–20 (11th Cir. 1984)). The Second Circuit has held that the Step Two requirement that the claimant have a severe impairment is "valid only if applied to screen out *de minimus* claims ..." *Dixon,* 54 F.3d at 1030 (citing *Bowen v. Yuckert,* 482 U.S. 137, 153–54 (1987) (O'Connor, J., concurring)).

Social Security regulations set forth the techniques used "at each level in the administrative review process" to evaluate mental impairments. 20 C.F.R. § 404.1520a. The ALJ must rate the degree of a claimant's functional impairments in each of four areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3) (referencing 20 C.F.R., Part 404, Subpart P, App'x 1 § 12.00C). The degree of limitation in the first three areas is rated using a five point scale: None, mild, moderate, marked, and extreme. *Id.* § 404.1520a(c)(4). A four-point scale is used to measure episodes of decompensation: None, one or two, three, four or more. *Id.* If the claimant's degree of limitation in the first three functional areas is rated as "none" or "mild," and "none" in the fourth area, the ALJ "will generally conclude that [the] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities[.]" *Id.* at § 404.1520a(d)(1), citing *Id.* § 404.1521.

Acosta was diagnosed with "depressive disorder" and "rule out borderline intellectual functioning" by consulting physician Dr. Helprin. (Tr. at 519.) Her former treating therapist, Deboarah Ryan, indicated that as of 2009 her diagnosis was Adjustment Disorder and Depressed Mood, noting that at the time of treatment she did not meet the criteria for a PTSD diagnosis. (*Id.* at 357.) Acosta testified that she does not "like to be around too many people," and does not "like to be around loud noises or screaming or yelling." (Tr. at 58.) She stated that while she takes Venlafaxine for depression, anxiety, and PTSD, the medication helps only "a little." (*Id.* at 58, 60.) Acosta self-reported, however, that she has no problems paying attention, finishing tasks, following instructions, getting along with other people at work, remembering things, or adapting to schedule changes. (*Id.* at 264-65.)

The ALJ applied the correct legal framework when considering the severity of Acosta's

impairments, noting his application of the four broad functional areas. (*Id.*, referring to 20 C.F.R., Part 404, Subpart P, App'x 1 § 12.00C.) The ALJ concluded that Acosta had "mild limitation" in the area of daily living activities, citing the opinions of consultative examiner Dr. Helprin, Acosta's "continued ability of independent personal care, lack of ongoing mental health treatment, and the opinions of the State Agency psychological consultant." (*Id.*) The ALJ also found mild limitation in the area of social functioning, citing that Acosta "lived with her boyfriend and socialized out of her apartment with his family" and that the consultative examiner "was of the opinion that [Acosta] was able to relate adequately with others." (*Id.*) The ALJ determined that Acosta has "mild limitation" in the area of concentration, persistence, and pace based on Acosta's self-reported activities of "reading, watching television, and playing videogames," and her alleged ability to handle finances. (*Id.*) Additionally, he cited the opinion of consulting examiner Dr. Helprin, who found that Acosta was "able to follow and understand simple directions and instructions, perform simple rote tasks and several complex tasks independently, maintain attention and concentration, maintain a regular schedule, make appropriate decisions, and deal appropriately with stress." (*Id.*) Finally, the ALJ concluded that Acosta had not experienced any episodes of decompensation of extended duration, such as a psychiatric hospital admission. (*Id.*)

Because Acosta's limitation was "mild" in the first three categories, and she had no episodes of decompensation, the ALJ properly concluded that Acosta's affective disorder was non-severe. 20 C.F.R. § 1520a(d)(1). Moreover, the record does not contain "evidence that otherwise indicates" that Acosta is more than minimally limited by her affective disorder. *Id.* Accordingly, the ALJ properly categorized Acosta's affective disorder as non-severe at Step 2.

Acosta also alleges that her left shoulder tendinopathy was improperly categorized as

non-severe. At the ALJ hearing, Acosta testified that she cannot lift "in a certain way" without experiencing "shooting pain through the neck and down [her] spine." (Tr. at 58.) ALJ Stacchini noted that the tendinopathy was confirmed by a March 2013 MRI, which revealed only "[m]ild tendinopathy of the supraspinatus tendon without evidence [of a] rotator cuff tear." (Tr. at 24, citing *id.* at 577.) The Court finds that this evidence was sufficient to support the ALJ's finding that Acosta's left shoulder tendinopathy caused no more than a minimal impairment. S.S.R. 85–28, 1985 WL 56856, at *2. Furthermore, the Court notes that ALJ Stacchini incorporated Acosta's lifting limitations into her RFC, which limited her to "only occasional left overhead reaching." (Tr. at 19.) Accordingly, the ALJ properly categorized Acosta's left shoulder tendinpathy as non-severe.

### 2.    New and Material Evidence Warrants Remand

Acosta submitted new evidence to the Appeals Council to support her request for a review of the ALJ's decision. The evidence included four pages of Dr. Booker's medical records reflecting Acosta's continued treatment for her back and neck pain in late 2013 through 2014, and subsequent spinal surgery in March 2014, performed by Dr. Booker.

Social Security regulations expressly authorize a claimant to submit new and material evidence to the Appeals Council when requesting review of an ALJ's decision. 20 C.F.R. §§ 404.970(b), 416.1470(b). When new evidence relates to a period on or before the ALJ's decision, the Appeals Council "shall evaluate the entire record including the new and material evidence submitted ... [and] then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b).

New evidence is defined as "new, and not merely cumulative of what is already in the record." *Sergenton v. Barnhart*, 470 F. Supp. 2d 194, 204 (E.D.N.Y. 2007) (citing *Lisa v. Sec'y of Health and Human Servs.,* 940 F.2d 40, 43 (2d Cir. 1991) (quotations and citations omitted)).

Material evidence is "both relevant to the claimant's condition during the time period for which benefits were denied and probative." *Id*. Additionally, "[t]he concept of materiality requires [] a reasonable possibility that the new evidence would have influenced the [the ALJ] to decide claimant's application differently." *Id*. Further, in cases when "a diagnosis emerges after the close of administrative proceedings that 'sheds considerable new light on the seriousness of [a claimant's] condition,' evidence of that diagnosis is material and justifies remand." *Lisa*, 940 F.2d at 44 (quoting *Tolany v. Heckler*, 756 F.2d 268, 272 (2d Cir. 1985)).

The evidence that Acosta submitted to the Appeals Council included a letter from Dr. Booker dated December 5, 2013, stating that Acosta was "scheduled for a Spinal Cord Stimulator Trial on 12/31/13," and the subsequent operative note on March 3, 2014, detailing Acosta's spinal cord stimulator implant. (*Id*. at 661, 662-64.) In his March surgery report, Dr. Booker stated, "[Acosta] has failed conservative therapy including opioids and physical therapy and it was felt that she would benefit from a spinal cord stimulator implant." (*Id*. at 662.)

The evidence submitted by Acosta satisfies the requirements that it be both new and material. First, although examination reports within the original administrative record reflect that a spinal cord stimulator implant was being considered,[14] Dr. Booker's letter and surgery report indicate that Acosta in fact pursued this course of action, thereby qualifying it as "new." (*Id*. at 661-62.) The evidence also provides the original medical opinion of Dr. Booker that "conservative therapy including opioids and physical therapy" had been unsuccessful. (*Id*. at 662.)

---

[14] Dr. Nasir examined Acosta on September 9, 2013, more than three months prior to the ALJ issuing his decision. In his examination notes, under the main heading "Treatment" and beneath "Cervical Radiculopathy," Dr. Nasir recorded, "pain management, spinal cord stimulator trial." (Tr. at 654.) On September 4, 2013, Dr. Booker completed a Physical Assessment for Determination of Employability for Acosta, also noting a recommendation for "spinal cord stimulator and pain meds." (*Id*. at 647.) This medical evidence was part of the initial record before ALJ Stacchini when he made his decision on December 20, 2013.

The evidence submitted to the Appeals Council is also material as it directly relates to Acosta's condition for the time period for which the benefits were denied. The entirety of the administrative record concerns the outstanding, chronic pain resulting from Acosta's back trauma in 2006. Because there has been no new injury to Acosta's back or spine, Dr. Booker's medical reports relate back to the period for which Acosta was seeking disability benefits. The evidence is also probative because it concerns a surgical procedure to correct a chronic pain condition that years of conservative treatment failed to alleviate. For these reasons, there is more than a reasonable possibility that the information contained in this new evidence would have influenced the ALJ to evaluate Acosta's application differently, particularly within the ALJ's assessment of Acosta's credibility.

The Commissioner argues that the Appeals Council was "entirely justified in concluding that the new evidence did 'not provide a basis for changing the ALJ's decision,'" pointing to the fact that the majority of the evidence arose after the ALJ's decision, and thus, outside the "time period relevant to this case." (Doc. 28, Reply Brief in Further Supp. of Def.'s Mot. for J. on the Pleadings ("Def.'s Reply") at 10.) This is an improper application of the legal standard, which requires only that the evidence "*relates* to the period on or before the [ALJ's] decision," not that it *occurs* prior to the decision. 20 C.F.R. § 404.970(b) (emphasis added.); *Farina v. Barnhart*, No. 04-CV-1299 (JG), 2005 U.S. Dist. LEXIS 739, at *15 (E.D.N.Y. Jan. 18, 2005) (finding that the Appeals Council erred in not reviewing a new medical report dated approximately two months after the ALJ's decision.).

The Commissioner further argues that the new evidence submitted by Acosta is immaterial because it fails "the appropriate test," which the Commissioner defines as "whether the record contains evidence that a reasonable mind might accept as adequate to support the

ALJ's findings." (Def.'s Reply at 11.) The Commissioner mistakenly applied the "substantial evidence" standard to this issue, which is a different legal standard from the material evidence standard. As stated above, evidence is considered material when it is "relevant to the claimant's condition during the time period for which benefits were denied and probative," in addition to when it raises a "reasonable possibility that the new evidence would have influenced the Secretary to decide claimant's application differently." *Sergenton*, 470 F. Supp. 2d at 204 (internal quotations omitted) (citing *Lisa,* 940 F.2d at 43).

The Court finds the new evidence relevant to and probative of Acosta's continued chronic condition, and recognizes a reasonable possibility that this evidence might have influenced the ALJ to make a different determination with respect to Acosta's application. Furthermore, Dr. Booker's diagnosis that Acosta failed conservative therapy "sheds considerable new light on the seriousness of [her] condition," justifying remand. *See Lisa*, 940 F.2d at 44 (quoting *Tolany*, 756 F.2d at 272). Accordingly, the Court remands this case so that the Commissioner may consider the post-hearing medical evidence.

### 3.    The ALJ's Assessment of Acosta's Subjective Symptoms is Not Supported by Substantial Evidence

Acosta alleges that the ALJ's credibility determination with respect to her subjective symptoms is unsupported by substantial evidence. The Act prescribes a two-step process for evaluating an individual's symptoms.[15] 20 C.F.R. §§ 404.1529(b), 416.929(b). First, a determination is made whether there exists an "underlying medically determinable physical or mental impairment" that could "reasonably be expected to produce the individual's pain or other symptoms." *Id.* Under this step, the ALJ is instructed not to "consider whether the *severity* of an

---

[15] A symptom is defined as "an individual's own description of her physical or mental impairments." S.S.R. 16-3P, 2016 WL 1119029, at *1.

individual's alleged symptoms is supported by objective medical evidence," but only whether the symptoms could be caused by an existing impairment. S.S.R. 16-3P, 2016 WL 1119029, at *1 (emphasis added). Step two involves the evaluation of the "intensity and persistence of an individual's symptoms, such as pain" and a determination of "the extent to which [the symptoms] limit the ability to perform work-related activities." 20 C.F.R. §§ 404.1529(c), 416.929(c).

Although the regulations have not been altered, the Commissioner issued a new Social Security Ruling, S.S.R. 16-3p, in March 2016. The purpose of this Ruling is to provide "guidance about how [to] evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims." S.S.R. 16-3P, 2016 WL 1119029, at *1. The Ruling supersedes the 1996 Ruling, S.S.R. 96-7p, which placed a stronger emphasis on the role of the adjudicator to make a "finding about the credibility of the individual's statements about the symptom(s) and its functional effects." S.S.R. 96-7P, 1996 WL 374186, at *1.

In contrast, S.S.R. 16-3p espouses a more holistic analysis of the claimant's symptoms, and "eliminate[s] the use of the term 'credibility'" from sub-regulation policy. S.S.R. 16-3P, 2016 WL 1119029, at *1. The Commissioner notes that the "regulations do not use this term," and by abandoning it, "clarif[ies] that subjective symptom evaluation is not an examination of an individual's character." *Id.* This corrected approach closely adheres to the regulatory language of the Act, shifting the focus to the evaluation of the intensity and persistence of the claimant's symptoms, not the undermining claimant's character.

Here, Acosta testified that she has numbness and weakness in the right side of her body, as well as tendonitis in her left shoulder. (Tr. at 51-53.) She explained that she cannot lift her left arm "in a certain way" without causing shooting pain through her neck and down her spine. (*Id.*

at 53, 55, 58.) She testified that her May 2012 surgery caused her symptoms to worsen. (*Id.* at 54-55.)  She cannot turn her neck fully to look over her left shoulder, and cannot look down without having a pulling and straining pain. (*Id.* at 65-68.)

ALJ Stacchini applied the two-step process for evaluating Acosta's symptoms. First, he acknowledged that Acosta's impairments could "reasonably be expected to cause the alleged symptoms." In the second step, however, he concluded that her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible," remarking that the "longitudinal evidence of the record supports a finding that [Acosta] is limited … but is not as limited as she alleges." (*Id.* at 21.) The ALJ then summarized the medical evidence in the record, concluding that Acosta's "allegations regarding her extreme limitations and symptoms are not credible." (*Id.* at 25.)

The ALJ's rejection of Acosta's symptoms, however, is not based on substantial evidence because he mischaracterized the medical evidence that he found contradicted Acosta's testimony. *See Ericksson*, 557 F.3d at 82-84. The ALJ noted that "[Acosta] denied improvement after her cervical surgery and even claimed worsening symptoms, but the medical records reflect after the surgery she had no weakness in her extremities, no radicular pain, non-severe right shoulder pain, and improved neck pain." (Tr. at 25.) Here, the ALJ cited to Dr. Cho's record dated October 11, 2012, a two-page compilation of all follow-up appointments after Acosta's May 2012 cervical spinal surgery. (*Id.*, citing *id.* at 585.) Although the report contains several organizational and timeline errors, it also includes evidence that Acosta was still experiencing pain in the months following the surgery: "She has left-sided neck pain. She has left upper extremity pain. She is taking Vicodin. PT has not been helpful to her. She still has residual neck pain. She has difficulty turning to the left and also looking up. When she looks up, she develops

headaches." (*Id.*) These persistent reports of pain must be weighed along with any reports of perceived improvement after the surgery. *Fuller v. Astrue*, No. 09-CV-6279 (GBD), 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010) (selective analysis of the record is improper). The ALJ, however, only incorporated evidence supporting his conclusion that Acosta's symptoms improved after the cervical spinal fusion surgery. For example, the ALJ accorded "great weight" to Dr. Cho's report but it was not the most recent evidence of the surgery's outcome. According to Dr. Dunkelman's report on May 15, 2013, the cervical spine surgery performed by Dr. Cho "failed" and Acosta's spinal condition was "chronic." (*Id.* at 567.)

ALJ Stacchini rejected Acosta's testimony that she had not walked for exercise since February 2010. (*Id.*) The ALJ points to the "Social History" section of Dr. Smith's records, which state, "[f]or exercise, she walks on a regular basis." (*Id.* at 433, 437, 439, 441, 443, 446, 448, 451, 643.) This section appears without a single word change in every examination report from her first visit in June 2011 through August 15, 2012. This once-recorded statement could just as easily indicate that the person who entered preliminary information did not routinely update the social history section. The record as a whole contains significant support for Acosta's statements that she had not regularly walked for exercise since 2010, including repeated reports of her limited daily activities found in the ALJ hearing transcript, Dr. Manyam's consultative examination report, and Acosta's April 18, 2012 function report, where she states, "I spend most of my day and night in bed laying down because I am in constant pain" and "my boyfriend does everything." (*Id.* at 52, 522-25, 258.)

Accordingly, remand is warranted for the ALJ to reconsider Acosta's testimony of her subjective symptoms of pain and "the extent to which [her pain] limit[s] [her] ability to perform work-related activities." 20 C.F.R. §§ 404.1529(c), 416.929(c).

### 4.      Remand is Warranted for Reconsideration of Acosta's RFC

Acosta argues that that the RFC assigned by ALJ Stacchini is not based on substantial

evidence because it fails to incorporate Acosta's testimony that she cannot turn her head fully to

look over her left shoulder and cannot look down without having a pulling, straining pain. (Pl.'s

Mem. at 9-10.) Acosta notes that the vocational expert testified that a person who was limited to

occasional rotation, flexion, or extension of the neck would be precluded from performing

Acosta's past relevant work. (*Id.* at 9.) Acosta also alleges that the ALJ did not adequately reflect

the limitations caused by her chronic neck pain. (*Id*. at 10.)

An RFC is intended to reflect a claimant's "maximum remaining ability to do sustained

work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel*,

198 F.3d 45, 52 (2d Cir. 1999) (citing S.S.R. 96-8p)). "A 'regular and continuing basis' means 8

hours a day, for 5 days a week, or an equivalent work schedule." *Id.* An RFC determination must

incorporate objective medical evidence as well as a claimant's subjective symptoms. *Genier*, 606

F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528,

404.1529(a), 404.1545(b). Accordingly, after the ALJ's reconsideration of Acosta's subjective

symptoms, it will be necessary for him to incorporate new determinations into Acosta's RFC.

The Court has considered the remainder of Acosta's arguments with respect to the ALJ's RFC

determination and finds them to be without merit.

### D.      Remand

Acosta requests that the Commissioner's decision be remanded for further administrative

proceedings, including *de novo* hearing and decision. Remand for further administrative

proceedings is appropriate "[w]here there are gaps in the administrative record or the ALJ has

applied an improper legal standard," *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999), or

when the decision is not based on substantial evidence. 42 U.S.C. § 405(g). Here, remand is

appropriate because ALJ's Stacchini's assessment of Acosta's subjective symptoms is not based

on substantial evidence, and for the ALJ to consider the new and material evidence submitted to

the Appeals Counsel. The Court remands for the ALJ to reconsider the evidence and reevaluate

Acosta's RFC, developing the record as needed. *Halloran*, 362 F.3d at 32.

## VI. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Acosta's motion for judgment on

the pleadings and **REMANDS** this case to the Commissioner for reconsideration in accordance

with this Order and Opinion. On remand, ALJ Stacchini must (1) consider the new and material

evidence from Dr. Booker that Acosta previously submitted to the Appeals Council; (2) evaluate

the intensity, persistence, and limiting effects of Acosta's symptoms according to S.S.R. 16-3P;

and (3) reconsider Acosta's RFC in light of the new evidence and reevaluation of her subjective

symptoms.

**SO ORDERED this 28th day of November 2016.**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**